United States District Court
For the Northern District of California

1

2

3                    IN THE UNITED STATES DISTRICT COURT

4               FOR THE NORTHERN DISTRICT OF CALIFORNIA

5

6
BERENICE ANGOTTI, DANIEL BORRERO,              No. C 05-5264 CW
7  RALPH E. COWLEY, JACK GRIFFITH,
DONALD S. MUELLER, KENT D. RUSSELL,            ORDER GRANTING IN
8  BERNARD W. SCHREINER and RAYMOND             PART PLAINTIFFS'
VALLI, on behalf of themselves and             MOTION FOR A
9  others similarly situated,                   PRELIMINARY
                                               INJUNCTION
10          Plaintiffs,

11     v.

12  REXAM, INC., and REXAM, INC. PENSION
AND BENEFITS COMMITTEE,
13
           Defendants.
14  _____/

15

16

17      Plaintiffs Berenice Angotti, Daniel Borrero, Jack Griffith,

18  Kent D. Russell, Sr. and Bernard W. Schreiner move for a

19  preliminary injunction requiring Defendant Rexam, Inc.[1] (Rexam) to

20  rescind its January, 2006 termination of Plaintiffs' medical and

21  prescription drug benefits.  Rexam opposes the motion for a

22  preliminary injunction.  The matter was heard on April 28, 2006.

23  Having considered all the papers filed by the parties and oral

24  argument on the motion, the Court grants in part the motion for a

25  preliminary injunction, as explained below.

26

27  _____

28      [1]Plaintiffs have voluntarily dismissed their claims against
former Defendant Rexam Pension and Benefits Committee.

BACKGROUND

Plaintiffs are retired former employees of Rexam who are or were eligible for health and other welfare benefits.  According to their complaint, Plaintiffs seek to represent two classes of retirees formerly represented by the International Association of Machinists and Aerospace Workers, AFL-CIO (IAM) and their dependents:  (1) those who retired from San Leandro or Modesto, California facilities covered by an independent collective bargaining agreement (CBA) between an IAM affiliate and Rexam or a Rexam predecessor; (2) those who retired from Kent or Vancouver, Washington or Gary, Indiana facilities covered by an independent CBA between an IAM affiliate and Rexam or a Rexam predecessor.[2] Plaintiffs have not yet moved for class certification.

The independent CBAs provide that retirees eligible for pensions will also receive health benefits.  Plaintiffs identify numerous agreements containing language either stating or implying that retirees will continue to receive health benefits for their lifetimes.  For instance, the San Leandro and Modesto plants' CBA for 1988-1991 sets forth the total maximum medical benefits to be received "during the life of the employee" and "during the life of

_____

[2]The claims of a third group, who retired from a facility covered by a "Basic Agreement" negotiated between IAM and Rexam or a Rexam predecessor, were severed from Plaintiffs' and transferred to the District Court of Minnesota, where a related case is pending, Rexam, Inc., v. United Steelworkers of Am., No. 03-CV-2998-ADM/AJB (D. Minn., filed May 20, 2003) (hereinafter Rexam I).
Rexam filed Rexam I against the United Steelworkers of America, the IAM, nine individual steelworker retirees and one machinist retiree.  Judge Ann D. Montgomery recently denied Rexam's motion for summary judgment against the IAM in that case.  Rexam I, February 21, 2006 Memorandum Opinion and Order.

United States District Court
For the Northern District of California

**United States District Court**

For the Northern District of California

the spouse . . . so long as the spouse does not remarry in the event of the pensioned employee's death."  Martorana Decl., Ex. 4A, San Leandro and Modesto Plants Agreement Between American National Can Co. and IAM, May 1, 1988-Apr. 30, 1991 at 77.[3]  Most of the Kent, Vancouver and Gary CBAs explicitly promise, "Major Medical coverage will be extended to cover retired employees for their lifetime."  Ex. 2A, Vancouver Plant Agreement Between National Can Co. and IAM, Apr. 16, 1981-Apr. 15, 1984 at 77.

The independent CBAs refer to coverage as provided by a "retired group insurance plan."  Some of those insurance plans also contain "lifetime" language.  The most recent plan covering San Leandro and Modesto retirees explains,

When Does Coverage End?

You coverage is continued for the rest of your life.

Your spouse's coverage will continue as long as he or she remains your spouse.  Should you die, coverage for your spouse will be continued for the remainder of their life or remarriage.

Ex. 6, American National Can Co. Group Benefit Plan for Retired Hourly Employees of the San Leandro & Modesto Plants Who Retired On or After May 1, 1991.  The 1988 and 1980 Summary Plan Descriptions (SPDs) of that plan similarly provide that "[a]ll Benefits for your dependent spouse will cease if your spouse remarries after your death.  Ex. 7, Group Benefit Plan for Retired Employees of the San Leandro & Modesto Plants Who Retired On or After May 1, 1988 at 2; Ex. 8, Group Insurance Plan for Retired Employees of the San

---

[3]Unless otherwise specified, all citations to exhibits refer to those attached to the Declaration of Frank Martorana.

**United States District Court**

For the Northern District of California

1  Leandro & Modesto Plants, Amended May 1, 1980 at 1.

2      However, the 1980 and 1988 San Leandro and Modesto SPDs also

3  provide,

4      If the Group plan is terminated or amended to terminate the
       insurance of any class [of] employees in which you are
5      included, your Group Life protection continues for 31 days.

6  Ex. 7 at 16; Ex. 8 at 18.  Elsewhere, these SPDs state, "Coverage

7  [or "insurance"] for yourself and your dependent spouse will

8  terminate if the group policies terminate."  Ex. 7 at 14

9  ("Coverage"); Ex. 8 at 16 ("Insurance").   The 1977 Summary Plan

10 Description (SPD) for San Leandro and Modesto's group benefits plan

11 contains a section on termination of insurance,

12     Insurance for yourself and your dependent will terminate when
       you are no longer eligible or if the group policies terminate.
13     Hospital, Surgical and Medical Benefits will terminate when
       you have received benefits equal to the total lifetime
14     maximum.   The insurance of a spouse will terminate if your
       spouse remarries after your death or if the spouse has
15     received benefits equal to the total lifetime maximum.

16 Ex. 9, Group Insurance Plan for Retired Employees of San Leandro

17 and Modesto Plants, National Can, Summary Plan Description, May 1,

18 1977 at 15.

19     In contrast to the "Basic" CBAs between Rexam and the IAM

20 (which are no longer at issue in this case), neither the

21 independent CBAs, the retiree health plans nor the SPDs contain a

22 clause reserving to Rexam the right to amend, modify or discontinue

23 retiree health benefits.  Herman Howell, a former San Leandro plant

24 employee who became the local IAM business representative in 1985

25 and the chief negotiator for the IAM's San Leandro and Modesto

26 employees in 1988, declares,

27     It has always been my understanding that retiree health

28                                    4

United States District Court

For the Northern District of California

benefits were guaranteed for the lives of the retiree and his
eligible spouse unless the spouse remarried.  By the time I
became involved in negotiations, retiree health benefits had
been provided under the collective bargaining agreement for
several years and most of the discussions about these benefits
were negotiations over improvement in these benefits, not
discussions about the duration of these benefits, which the
Union believed was long settled.

Howell Decl. ¶ 6.

The plans do contain "coordination of benefits" clauses.  For

instance, the 1988 San Leandro and Modesto SPD states,

If an insured person is entitled to any medical, dental care
or major medical benefits or services from another source
. . . such benefits under this plan may be reduced to an
amount, which, together with all such other benefits, will not
exceed 100% of any necessary, reasonable and customary item of
expense covered under this plan or any such other plan.

Ex. 7 at 14.  The plan addresses coordination of benefits with

Medicare in particular detail.  Id. (providing that the company

will reimburse retirees for actual Medicare Part B premium up to

$20 per month).

Language in some of the CBAs and Plans refers to the

"continuation" of group insurance coverage, i.e. statements in the

CBAs that retiree health insurance "will remain in effect."  For

instance, the continuation clause in the 1989-1993 Vancouver CBA

states,

The Retired Group Insurance Plan described in the booklet
entitled "Our Plan of Group Insurance for Hourly Retired
Employees" will remain in effect without cost to the retired
employees.

Ex. 2B at 86.  Other CBAs and SPDs do not contain continuation

clauses.

Over the years, Rexam has changed retirees' health benefits

after their retirement.  As Genevieve Barratt, a former director of

5

benefits for American Can, explained in an August 1, 1994 letter to participants in the plans,

> We're pleased to tell you about a new program designed to reduce the cost of your prescription purchases. This program will go into effect September 1, 1994. Once you've read the details, we're sure you will agree the new program is an improvement to your health care plan and offers many advantages.

Ex. 15, R047801. In 2001, Rexam's medical plan administrator, United Healthcare, was administering 146 different union and non-union retiree health plans, of which 34 were associated with various groups of IAM retirees. Second Hardin Aff. ¶ 4. Many of these plans had similar benefit levels, and in 2001 the IAM plans were modified and consolidated to just six plans, four for current retirees and two for future retirees. Id. To the extent that pooled plans had different benefit levels, Rexam generally chose to provide more generous benefits to all of the retirees in the newly consolidated group. Id. ¶ 5. For instance, San Leandro and Modesto retirees who retired prior to 1983 received major medical and prescription drug coverage for the first time in 2002. Id. ¶ 7. Don Hardin, Rexam's benefits consultant, describes this as a unilateral decision to improve benefits to some retirees in order to streamline administration. Id.

In memos dated September, 2005, Rexam distributed information to its retirees stating that their company-provided health benefits would be discontinued. Retirees who were enrolled in Rexam's "Prescription Drug Only" coverage were informed that they would have to enroll in Medicare Part D, the new voluntary prescription drug plan taking effect January 1, 2006. Retirees receiving an

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

allowance to supplement Medicare Part B (outpatient medical) coverage were informed that this benefit would be discontinued beginning January 1, 2006.  Retirees enrolled in a "post-65 Medical Plan" were informed that Rexam would be discontinuing its retiree medical and prescription drug benefits.  Plaintiffs charge that these changes breached Rexam's obligations under the relevant CBAs and ERISA welfare plans.

Plaintiffs are retirees on fixed incomes.  In support of their initial motion for preliminary injunctive relief, they and other similarly situated retirees declared that they believed they would receive Rexam medical benefits for their lifetimes and therefore did not budget for supplemental medical and prescription drug expenses.  They declared that Rexam's proposed termination of their medical and prescription drug benefits would cause their monthly medical costs to increase and their standards of living to decrease.

Now, several months after Rexam's termination of medical benefits, some retirees have been or are being forced to make difficult decisions in order to compensate for the reduction in benefits.  Mr. Russell lives on a fixed income including Social Security and a $2,250 per month (post-tax) pension.  Since Rexam terminated his benefits, he pays an additional $132 per month for supplemental medical insurance, $41 per month for prescription drug insurance and $12 per month towards his Medicare Part B premium.  Supp. Russell Decl. ¶ 4.  Because his prescription for a brand name acid reflux drug now comes with a much higher co-payment, Mr. Russell has started cutting dosages in half and sharing pills with

7

United States District Court

For the Northern District of California

a family member who takes the same drug.  Id. ¶ 5.  Mr. Russell, who is diabetic, also can no longer afford "test strips" to measure his blood sugar every morning; again, he has been receiving some from a family member, but worries that that person "has been shorting himself so I can get the test strips."  Id. ¶ 5.  Mr. Russell has been told by his doctor that he needs prostate surgery, but is not sure whether he can afford it.  Id. ¶ 6.

Barbara Smith and her husband, Billy Smith, a retiree from the Modesto plant, live on two pensions worth a total of $1332 per month and Social Security.  Since Rexam terminated their supplemental benefits, the Smiths obtained alternative coverage that costs an additional $136 per month for medical and prescription drug coverage; they now have a new $250 yearly deductible for hospital stays.  Smith Decl. ¶ 9.  The Smiths no longer have dental coverage provided by Rexam; Ms. Smith, not realizing that her dental coverage had been cut, went to the dentist in January and was told that she would need to pay $8,000 in order to get new plates and titanium screws due to bone loss in her mouth and jaw.[4]  Id. ¶ 11.  The Smiths cannot afford this amount, so the dental work cannot be done.  Because she switched insurance providers, Ms. Smith can no longer see her trusted doctor, who, in 2005, supervised her breast cancer treatment, which included two surgeries, chemotherapy and radiation.  Id. ¶ 12.  Ms.

_____

[4]According to Mr. Hardin, "[b]ecause of the limitations on certain dental procedures, it is impossible for [him] to determine what reimbursement, if any, Ms. Barbara Smith would have received for her claimed $8,000 in dental bills."  Second Hardin Aff. ¶ 10. He also notes that only the Modesto retirees had received dental coverage.

United States District Court

For the Northern District of California

Smith states that her 2005 illness would have financially devastated her family had it not been for Rexam's coverage of all out-of-pocket costs above $1,500. Id. ¶ 13. Because of the recent decline in benefits, Mr. Smith's standard of living has decreased; he is no longer able to afford trips for hunting and fishing. Id. ¶ 14.

Other retirees report facing similarly difficult decisions. Donald Weseman and his wife now pay an extra $261.14 per month premium for supplemental medical insurance and have cut back on gas purchases for grocery trips and visiting family. Weseman Decl. ¶ 11. Ms. Angotti, who refilled all her prescriptions at the end of 2005 and has since not seen a doctor, is concerned that once she starts paying new medical costs, she may have to move out of her house or stop payments on her life insurance policy, which she intended to leave to her children. Supp. Angotti Decl. ¶ 5. Jack Griffith and his wife, whose monthly income includes only a $1,013 (after-tax) per month pension and Social Security, can no longer afford dental and vision coverage, and therefore paid $283 to get two cavities filled. (Had he still received Rexam dental benefits, he believes 90% of that cost would have been covered.) Supp. Griffith Decl. ¶ 4. He is not sure if his glaucoma is considered a medical or vision problem. Although Mr. Griffith is able to obtain prescription drug coverage through the Veterans' Administration, the VA will not pay for two drugs, or anything similar, formerly covered by the Rexam plan: Singulair, for breathing problems, and Actos, for diabetes. Id. ¶ 5. Mr. Griffith cannot afford to pay for these drugs himself, and is not sure what he will do when his

9

current prescriptions run out.  Id.  Alyce Asch and her husband

have no income other than Social Security and $1330 per month in

combined pensions; their health care costs have increased by at

least $175 per month in additional insurance premiums and

prescription drug co-payments, as well as 100% of any drug costs

for the year that fall between the $2250 and $3600 "doughnut hole"

in their new Kaiser coverage.  Asch Decl. ¶¶ 8-10.  Because of

these increased medical costs as well as loans for two major

expenses in the previous year (a new heat pump and a car), the

Asches have cut out additional expenses such as magazine

subscriptions, cell phone use and travel to visit family.  Id.

¶ 11.  Judy Bond states that her parents, who both needed hospital

care in 2005, had trouble finding alternative coverage due to her

mother's pre-existing condition, and now cannot afford the high

deductible for a major hospital stay under their new insurance; Ms.

Bond anticipates that she would have to sell her house and move in

with her parents if the need for another hospital stay arose.  Bond

Decl. ¶¶ 7, 9.

     Meanwhile, Rexam's consultant Jeff Ries states that the named

class representatives received relatively little in benefits from

Rexam as the secondary payor to their coverage under Medicare Parts

A and B; Mr. Borrero received no such benefits, while Mr. Russell

received $1,696 in benefits.  Second Ries Aff. ¶ 3.  Mr. Ries does

not address the past medical needs of the other prospective class

members who submitted declarations, such as the Smiths, the

Wesemans, the Asches or Ms. Bond's parents.  With respect to

prescription drug benefits, Mr. Ries calculates that Rexam paid

approximately $316,000 for members of the proposed classes during 2005, with an average payment of $68 per month per retiree. Id. ¶ 4.   Considering all of the benefits terminated by Rexam, Mr. Ries estimates generally that the average San Leandro or Modesto retiree will incur $86 in additional monthly medical costs, while the average Kent, Vancouver or Gary retiree will incur $78 per month in additional costs. Id. ¶ 7. However, Mr. Ries does not include the cost of monthly Medicare Part D premiums in his calculations.

Rexam does not contend that it would suffer financial hardship if it were required to reinstate benefits for IAM retirees who retired under the San Leandro, Modesto, Vancouver, Kent and Gary CBAs.   However, Charlotte Reilly, Rexam's Vice President of Benefits, states that the administrative costs of transitioning members of the Plaintiff class back to Rexam plans would be $122,000 and would take approximately three to six weeks to complete.   Third Reilly Aff. ¶ 5. She states that Rexam would incur $80,000 in administrative costs and pay approximately $424,000 per year (based on 2005 costs) in benefits if these retirees were reinstated. Id. ¶ 6. Ms. Reilly also declares that Rexam would be unable to take advantage of approximately $100,000 in tax credits on its prescription drug benefits; because Rexam planned to discontinue those benefits, it did not provide the IRS with evidence of creditable drug plan coverage by October 31, 2005, as required for the tax break.

Mr. Hardin declares that given "the significant variation in approved Medicare Part D plan designs coordinating with Medicare Part D is costly and complex to communicate and administer."

11

United States District Court
For the Northern District of California

Second Hardin Aff. ¶ 21.

Plaintiffs filed this lawsuit and applied for a temporary restraining order (TRO) on December 20, 2005. The Court found that although Plaintiffs raised at least serious questions regarding the merits of their case and had made a showing of a likelihood of irreparable harm, their showing of need for a TRO was undercut by their belated filing of the case and their failure to seek injunctive relief in a court already familiar with the case, such as the District of Minnesota. The Court also found that Rexam made a strong initial showing in support of the transfer of at least some Plaintiffs' claims to Minnesota. Accordingly, the Court denied Plaintiffs' motion for a TRO, and postponed ruling on their request for a preliminary injunction until after deciding Rexam's motion for a transfer. The Court later transferred the claims of one group of IAM retirees to Minnesota. See February 14, 2006 Order Granting in Part and Denying in Part Defendants' Motion to Transfer. Plaintiffs filed their renewed motion for a preliminary injunction on March 3, 2006.

LEGAL STANDARD

"The basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982). To establish entitlement to a preliminary injunction, a moving party must demonstrate either:

(1) a combination of probable success on the merits and the possibility of irreparable harm, or

(2) that there exist serious questions regarding the merits and the balance of hardships tips sharply in its favor.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215, 1217 (9th Cir. 1987); California Cooler, Inc. v. Loretto Winery, Ltd., 774 F.2d 1451, 1455 (9th Cir. 1985); see also William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 526 F.2d 86, 88 (9th Cir. 1975); County of Alameda v. Weinberger, 520 F.2d 344, 349 (9th Cir. 1975).  The test is a "continuum in which the required showing of harm varies inversely with the required showing of meritoriousness."  Rodeo Collection, 812 F.2d at 1217 (quoting San Diego Comm. Against Registration and the Draft v. Governing Bd. of Grossmont Union High Sch. Dist., 790 F.2d 1471, 1473 n.3 (9th Cir. 1986)).  To overcome a weak showing of merit, a plaintiff seeking a preliminary injunction must make a very strong showing that the balance of hardships is in its favor.  Rodeo Collection, 812 F.2d at 1217.

                              DISCUSSION

I.  Nature of Proposed Injunctive Relief

     The parties dispute whether the injunctive relief sought by Plaintiffs is mandatory or prohibitory in nature.

     Mandatory injunctions, which are subject to a higher standard than prohibitory injunctions, are those that involve "preliminary relief that goes well beyond simply maintaining the status quo pendente lite."  Stanley v. University of S. Cal., 13 F.3d 1313, 1319 (9th Cir. 1994) (quoting Martin v. Int'l Olympic Comm., 740 F.2d 670, 674-75 (9th Cir. 1984)); accord Anderson v. United States, 612 F.2d 1112, 1114 (9th Cir. 1980) (citing Martinez v. Mathews, 544 F.2d 1233, 1243 (5th Cir. 1976)).  The Ninth Circuit has explained that the "status quo ante litem refers not simply to

                                   13

any situation before the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending controversy.'" GoTo.com, Inc., v. Walt Disney Co., 202 F.3d 1199, 1210 (9th Cir. 2000) (quoting in part Tanner Motor Livery, Ltd. v. Avis, Inc., 316 F.2d 804, 809 (9th Cir. 1963)).  For instance, in GoTo.com, the court found the status quo ante litem to be the situation that existed prior to the defendant's use of an allegedly infringing logo, which then precipitated the lawsuit.

As Rexam notes, Plaintiffs' proposed preliminary injunction would require it to take affirmative action, namely resuming payment and administration of benefits.  However, Rexam's focus on the present necessity for affirmative conduct ignores the Ninth Circuit's use of a comparison between the proposed relief and the status quo ante litem to test whether an injunction constitutes disfavored mandatory preliminary relief.  Rexam relies on Dahl for its argument that an injunction that would require affirmative action should be treated as mandatory.  Yet Dahl never addressed the issue presented here and in GoTo.com of determining the appropriate status quo ante litem with which to compare the proposed injunctive relief.  In Dahl, former patient participants in a clinical trial sued to require the defendant to continue providing them with experimental medication after the clinical trial had ended.  7 F.3d at 1401.  Thus, the preliminary injunction in Dahl did not merely preserve the plaintiffs' last uncontested status.  Similarly, in In re White Farm Equip. Corp., 788 F.2d 1186 (6th Cir. 1986), the Sixth Circuit referred, in dicta, to an injunction obtained by retirees requiring their former employer to

14

reinstate their health benefits as a "mandatory injunction."
Unlike the Rexam retirees, the <u>White Farm Equip.</u> retirees' coverage
was discontinued prior to their commencement of an adversary
proceeding in bankruptcy court.  788 F.2d at 1188-89.  To the
extent that <u>White Farm Equip.</u> holds that any reinstatement of
benefits constitutes a mandatory injunction, it appears to be in
conflict with <u>GoTo.com</u>, and it is the latter that is binding on
this Court.

Here, Plaintiffs filed suit prior to Rexam's termination of
their benefits.  Therefore, Plaintiffs' proposed injunctive relief
would simply preserve the last uncontested status preceding the
current litigation.  <u>See</u> <u>United Steelworkers of Am., AFL-CIO v.</u>
<u>Textron, Inc.</u>, 836 F.2d. 6, 10 (1st Cir. 1987) (holding that a
preliminary injunction requiring company to resume payment of life
and health insurance premiums was prohibitory, not mandatory)
(citing <u>Westinghouse Elec. Corp. v. Free Sewing Mach. Co.</u>, 256 F.2d
806, 808 (7th Cir. 1958)).  Rexam acted at its peril when it
decided to proceed with its intended termination of Plaintiffs'
benefits even after this lawsuit was filed.  <u>See</u> <u>Desert Citizens</u>
<u>Against Pollution v. Bisson</u>, 231 F.3d 1172, 1187 (9th Cir. 2000)
(noting that if a defendant is notified of the pendency of a suit
seeking an injunction, defendant acts at its peril even if a
temporary injunction is not granted).  To the extent that Rexam had
already incurred administrative costs in anticipation of its
January 1, 2006 termination of benefits by the time Plaintiffs
filed suit, the consideration of these costs is incorporated in the
usual balancing test for preliminary injunctive relief.

15

1    Therefore, the Court applies to Plaintiffs' request the usual

2    standard for prohibitory injunctive relief.

3    II.   Likelihood of Success

4    Plaintiffs assert that their medical benefits are vested

5    according to the relevant CBAs, SPDs and plans, and thus Rexam's

6    termination of those benefits is unlawful.  Rexam denies that the

7    benefits at issue are vested.

8    A.   Applicable Law: ERISA and LMRA Claims

9    ERISA requires that welfare benefit plans be "established and

10   maintained pursuant to a written instrument."  29 U.S.C.

11   § 1102(a)(1).  Employers must provide employees with a written

12   "Summary Plan Description" (SPD) that contains twelve required

13   categories of information and is "written in a manner calculated to

14   be understood by the average plan participant" and "sufficiently

15   accurate and comprehensive to reasonably apprise such participants

16   and beneficiaries of their rights and obligations under the plan."

17   29 U.S.C. § 1022(a).  Any modifications to a welfare benefit plan

18   must also be written in a manner calculated to be understood by the

19   average plan participant and furnished according to the

20   requirements of 29 U.S.C. § 1024(b)(1).  <u>Id.</u>  Inconsistencies

21   between the language of an ERISA master plan document and an SPD

22   are resolved in the employee's favor.  <u>Bergt v. Retirement Plan for</u>

23   <u>Pilots Employed by MarkAir, Inc.</u>, 293 F.3d 1139, 1145 (9th Cir.

24   2002).

25   Under ERISA, "[h]ealth care benefits provided in an employee

26   benefit plan are not vested benefits; the employer may modify or

27   withdraw these benefits at any time, provided the changes are made

28                                16

in compliance with . . . the terms of the plan." Serrato v. John
Hancock Life Ins. Co., 31 F.3d 882, 884 (9th Cir. 1994) (quoting
Doe v. Group Hosp. & Med. Servs., 3 F.3d 80, 84 (4th Cir. 1993)).
Welfare benefit plans "are generally neither vested nor accrued,"
but the parties may set out in plan documents whether the benefits
vest or whether they may be terminated. Cinelli v. Security Pac.
Corp., 61 F.3d 1437, 1441 (9th Cir. 1995). A contractual agreement
for vesting of benefits must be found in the plan documents. Id.
Similarly, a retiree's right to receive lifetime medical benefits
at a particular cost "can only be found if it is established by
contract under the terms of the ERISA-governed benefit plan
document." Pisciotta v. Teledyne Indus., Inc., 91 F.3d 1326, 1329
(9th Cir. 1996). Thus, whether or not retirement health benefits
are vested may be a matter of contractual interpretation. Int'l
Assn. of Machinists and Aerospace Workers v. Masonite Corp.
(hereinafter IAM), 122 F.3d 228, 231 (5th Cir. 1997); Murphy v.
Keystone Steel & Wire Co., 61 F.3d 560, 564 (7th Cir. 1995).

The question of vesting is also at issue in a claim under the
LMRA. If retiree medical insurance constitutes a vested benefit
under a CBA, that benefit cannot be ended without the retirees'
consent. Bower v. Bunker Hill Co., 725 F.2d 1221, 1223 (9th Cir.
1984) (citing Allied Chemical & Alkali Workers v. Pittsburgh Plate
Glass Co., 404 U.S. 157, 181 n. 20 (1971)).

If a CBA "unambiguously limited medical benefits to the term
of the agreement, no benefits were vested." Id. at 1223 (citing
Turner v. Local Union No. 302, Int'l Bhd. of Teamsters, 604 F.2d
1219, 1225 (9th Cir. 1979)). However, the inverse is not

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

necessarily true; a CBA that does not unambiguously limit medical benefits to the term of the agreement does not result in presumptively vested benefits.  This is consistent with Bower because, as Rexam notes, Bower involved the review of a grant of summary judgment to the company, and thus all possible inferences from the record were drawn in the retirees' favor.  See also Baumgardner v. Smurfit-Stone Container Corp., 347 F. Supp. 2d 927, 932 (D. Or. 2004) (noting in context of motion to dismiss that dismissal would be improper if there is any ambiguity as to rights created under CBA).  On the other hand, the ERISA presumption against vesting does not apply to collectively-bargained-for welfare benefits if the CBAs are ambiguous.  To the contrary, courts in this circuit have noted a "distinction between entitlement to benefits under a CBA--resulting from a process of collective bargaining--and an entitlement to benefits under an ERISA plan--adopted by an employer solely at its discretion." Baumgardner, 347 F. Supp. 2d at 933 (citing Krishan v. McDonnell Douglas Corp., 873 F. Supp. 345, 351 (C.D. Cal. 1994) (distinguishing collectively-bargained agreements from the usual ERISA context with respect to the admission of extrinsic evidence)).  Indeed, a presumption against vesting would seem to contradict the Ninth Circuit's approach in Bower.  But see, e.g., Murphy v. Keystone Steel & Wire Co., 61 F.3d 560, 565 (7th Cir. 1995) (holding that if either CBA or ERISA document is silent on the issue of vesting, then rebuttable presumption exists that benefits were not intended to vest); Bidlack v. Wheelabrator Corp., 993 F.2d 603, 608 (7th Cir. 1993) (en banc) (noting that if CBA is

18

silent on the duration of health benefits for retirees, then
extrinsic evidence not admissible to show lifetime entitlement).

If the language of a CBA is ambiguous, then the court may
consult extrinsic evidence to help resolve the ambiguity.  The
Ninth Circuit has explained,

> When the operation of an ordinary contract is not clear from
> its language, a court generally may consider extrinsic
> evidence to determine the intent of the parties in including
> that language.  That principle is applied with even greater
> liberality in the case of a CBA.  In ascertaining the intent
> of the parties to a CBA, 'the trier of fact may look to the
> circumstances surrounding the contract's execution, including
> the preceding negotiations . . . It may also consider the
> parties' conduct subsequent to contract formation . . . and
> such conduct is to be given great weight.'

Ariz. Laborers, Teamsters & Cement Masons Local 395 Health &
Welfare Trust Fund v. Conquer Cartage Co., 753 F.2d 1512, 1517-18
(9th Cir. 1985) (emphasis and internal citation omitted) (quoting
Laborers Health & Welfare Trust Fund v. Kaufman & Broad, 707 F.2d
412, 418 (9th Cir. 1983)).

B.   Discussion

Plaintiffs argue that the collectively-bargained-for documents
are unambiguous: the parties intended for retirees to receive
health benefits for each retiree's "lifetime."  Because the Court
finds that Plaintiffs have demonstrated a likelihood of success
even if those documents are ambiguous, and because the parties'
briefing does not adequately address each individual CBA and Plan,
the Court will not decide at this time whether particular documents
are ambiguous.

At the least, the "lifetime" language contained in almost all
of the CBAs and plans is strong evidence that the parties intended

19

United States District Court

For the Northern District of California

to vest retiree health benefits.[5]  The most arguably ambiguous
lifetime language is that in the Modesto and San Leandro CBAs prior
to May 1, 1991, yet even these CBAs contain language that is highly
probative of vesting, namely references to maximum benefits
received "during the life of the employee" and "during the life of
the spouse."  These collectively-bargained-for statements would
hold little meaning if the benefits could be unilaterally revoked
by Rexam after the expiration of the CBA.

Rexam argues that such "lifetime" language refers only to the
duration of coverage on an individual basis, and is not sufficient

---

[5]In their supplemental submission, the parties identify a few
exceptions in which neither the CBA nor the applicable plan
contains any lifetime language.  The parties are not aware of any
class member who retired as early as these: Kent, March 1, 1974 to
April 15, 1981; Vancouver, March 1, 1974 to April 15, 1981; and
Gary, June 2, 1971 to June 1, 1981.  See Joint Supp. Submission Re:
Pls.' Mot. for a Prelim. Inj., Exs. A, C and D.  However, the
parties have identified a class member who retired under
the Vancouver CBA that was in place from April 16, 1978 to April
15, 1981; this CBA does not any include lifetime language.  Id.,
Ex. C.
     The primary ground for relief identified by Plaintiffs with
respect to those Vancouver retirees is the connection between
eligibility for pension benefits and eligibility for medical
benefits.  In Int'l Union v. Yard-Man, Inc., 716 F.2d 1476, 1482
(6th Cir. 1983), a case cited by the Ninth Circuit in Bower, the
court held that "when the parties contract for benefits which
accrue upon achievement of retiree status, there is an inference
that the parties likely intended those benefits to continue as long
as the beneficiary remains a retiree."  The Sixth Circuit
subsequently clarified that there was no legal presumption of
vesting based on retiree status.  See Int'l Union v. Cadillac
Malleable Iron Co., 728 F.2d 807, 808 (6th Cir. 1984).  Likewise, a
reasonable inference could be drawn here that the parties intended
medical benefits to be concomitant with pensions, which, as Rexam
itself argues, were expressly vested for life.  But see Anderson v.
Alpha Portland Indus., Inc., 836 F.2d 1512, 1517 (8th Cir.)
(disagreeing with Yard-Man to the extent that it recognizes an
inference of an intent to vest).  Thus, the parties could have
deemed it unnecessary to use the same express language to discuss
medical benefits as had already been used to vest pensions.

United States District Court

For the Northern District of California

1   to establish vesting.  However, the case law shows only that this

2   type of "lifetime" language may not vest benefits when contained in

3   the same document as a clear reservation of rights clause, which

4   none of the CBAs at issue in this litigation contain.  <u>See, e.g.</u>,

5   <u>In re Unisys Corp. Retiree Med. Benefit ERISA Litigation</u>, 58 F.3d

6   896, 903-04 (3rd Cir. 1995) (holding that plan not ambiguous where

7   SPD contained both "lifetime" language and a clear, broad

8   reservation of rights clause); <u>Jensen v. SIPCO, Inc.</u>, 38 F.3d 945,

9   950 (8th Cir. 1994) (holding that ERISA plan ambiguous as to

10  vesting where it contained both lifetime language and an

11  unambiguous reservation of rights clause); <u>Anderson v. Alpha</u>

12  <u>Portland Indus.</u>, 836 F.2d at 1518 (construing in larger context a

13  phrase providing continuing health insurance "until death of

14  retiree" to limit the company's obligation to provide benefits

15  until death, but noting that phrase itself was "highly probative of

16  intent to vest benefits"); <u>United Mine Workers of Am. v. Brushy</u>

17  <u>Creek Coal Co.</u>, 410 F. Supp. 2d 723, 727-28 (S.D. Ill. 2006)

18  (finding contract to be ambiguous where it contained both lifetime

19  language and a reservation of rights clause).  For instance, in

20  <u>Pisciotta v. Teledyne Indus., Inc.</u>, 91 F.3d 1326, 1329-31 (9th Cir.

21  1996), the Ninth Circuit found that a booklet containing "lifetime"

22  language was not probative evidence that ERISA welfare benefits had

23  vested where the booklets also did not meet the statutory

24  definition of an SPD and the booklets contained a disclaimer

25  stating that a contract would be the controlling document, and that

26  contract in turn contained a clear reservation of rights clause.

27      Plaintiffs also point to extrinsic evidence of intent to vest,

28                                  21

United States District Court

For the Northern District of California

at least for certain time periods.  Mr. Howell declares that it was always the intent of the parties to the San Leandro and Modesto CBAs that medical benefits for retirees would be vested, and the retirees' statements reflect a similar understanding.  Rexam's conduct prior to the instant dispute, which never involved a significant termination or reduction in benefits, is consistent with Mr. Howell's testimony that retiree health benefits were a continuing, bargained-for obligation rather than a benefit provided at Rexam's pleasure.

Rexam argues Plaintiffs are nevertheless unlikely to succeed, due to additional language in the CBAs as well as other extrinsic evidence showing that the benefits at issue were not vested.  Rexam argues that "continuation" language, i.e. statements in the CBAs that retiree health insurance "will remain in effect," is inconsistent with vesting.  However, the cases on which Rexam relies for this proposition did not involve the same type of continuation language used here.  For instance, in <u>Anderson v. Alpha Portland Industries</u>, the appellate court found that the following continuation language, combined with explicit reservation of rights language, supported a finding that medical benefits were not vested:

> Insurance coverages under the Prior Programs not hereinafter provided shall be continued to the extent applicable to Retirees and their Dependents in accordance with the provisions of the Prior Programs as if fully set out herein and as the same may now or hereinafter be amended, modified or supplemented in collective bargaining between the parties.

836 F.2d at 1514-1515; <u>see also</u> <u>DeGeare v. Alpha Portland Indus., Inc.</u>, 837 F.2d 812, 813 (8th Cir. 1988) (same contract).  In

contrast, the continuation language that Rexam identifies here in certain of the CBAs or plans simply states generally that the CBA or plan "will remain in effect" during the term of the CBA or plan. This language is no different from similar statements regarding pensions, e.g. "the 1968 Pension Plan . . . will remain in effect for the term of this Agreement dated April 16, 1984 and any extensions thereof." Ex. 20A, Vancouver CBA at 83. Certainly, it is undisputed that the pensions were vested, notwithstanding so-called continuation language. The Court finds that Plaintiffs are likely to succeed despite the presence of this continuation language.

Rexam notes that the CBAs contain express language vesting Plaintiffs' pensions, and argues that, had the parties intended to vest health benefits, they would have used the same express vesting language to do so. For instance, the Pension Plan Agreement attached to the June 2, 1978-June 1, 1981 Gary CBA contains a survival clause, stating,

> The Company guarantees the payment of the pension and survivor benefits provided in the [Pension Plan] Agreement for all employees and survivors who are granted benefits during the term of this Agreement. . . . The termination of the other provisions of this Agreement shall not affect the validity of this covenant, which shall remain binding upon the Company until it shall have been fully performed. No benefit properly payable pursuant to this Agreement shall be discontinued or reduced or denied except as provided herein.

Rexam's argument would be more persuasive if the CBAs contained a reservation of rights clause or some other more direct indication of an intent not to vest health benefits. In the context of these CBAs, however, the absence of express vesting language regarding medical benefits is fairly susceptible to two alternative

explanations: both Rexam's position that the parties intended that medical benefits not be vested, and Plaintiff's position that eligibility for retiree health benefits was linked to eligibility for pensions.

Rexam notes that some of the ERISA plans themselves unambiguously state that benefits are terminable. See Cinelli, 61 F.3d at 1444 (finding ERISA plan provision that insurance would terminate upon discontinuation of the policy to be unambiguous indication of company's right to terminate policy at will). For instance, the San Leandro and Modesto group insurance plan, effective May 1, 1977, states, "Insurance for yourself and your dependent will terminate when you are no longer eligible or if the group policies terminate." Although this argument may be persuasive with respect to Plaintiffs' ERISA claims under those plans, it does not address Rexam's obligation under the CBAs. Furthermore, another persuasive reading of this plan provision, especially in the context of the CBAs' references to "lifetime" coverage maximums, is that the company may switch or terminate its participation in a particular insurance plan, but not reduce or terminate contractually agreed-upon benefits.

Rexam also claims that many of the CBAs include express provisions terminating benefits upon expiration of the CBA. For instance, it points to the 1991 San Leandro and Modesto CBA's provision that the

> maximum benefit for any one retired employee or eligible defendant has been increased from $20,000 to $100,000 with respect to the entire duration of coverage of any one retired employee or dependent under the [plan].

24

United States District Court

For the Northern District of California

However, this excerpt does not expressly state that the "duration
of coverage" is the same as the duration of the CBA, and instead
begs the question of whether the "duration of coverage" for a
retiree was intended to be his or her lifetime.  Cf. Cherry v.
Auburn Gear, Inc., 441 F.3d 476, 482 (7th Cir. 2006) (holding that
the promise in CBA to provide welfare benefits "during the period
of this agreement" unambiguously showed that benefits did not
vest); John Morrell, Co. v. United Food and Commercial Workers
Int'l Union, 37 F.3d 1302, 1307 (8th Cir. 1994) (finding clause
expressly limiting duration of retirement health benefits to
duration of master agreement to be inconsistent with intent to vest
health benefits for life).  Here, Rexam does not identify more
specific durational clauses like those that the Seventh Circuit has
held result in an unambiguous lack of vesting.  See Bidlack v.
Wheelabrator Corp., 993 F.2d 603, 607 (7th Cir. 1993) (rejecting
the "extreme position" that "the contract must either use the term
'vest' or must state unequivocally that it is creating rights that
will not expire when the contract expires").  Moreover, to the
extent that Rexam argues that the CBAs' own duration clauses (most
are for four years) means that an otherwise ambiguous contract did
not vest welfare benefits, this would create a presumption against
vesting of retiree health benefits that would be inconsistent with
the approach taken by the Ninth Circuit.  See Bower, 725 F.2d at
1223 (noting that although CBA has expiration date, the medical
insurance program is "not necessarily bound by this date").

    Rexam argues that "coordination of benefits" clauses are
inconsistent with vesting at fixed levels, or vesting at all.

25

United States District Court

For the Northern District of California

Under Eighth Circuit law, such clauses do weigh against vesting, although, as Judge Montgomery noted, a coordination of benefits clause is still "just a factor to consider in the entirety of the documents." Rexam I, Summary Judgment Order at 13. See, e.g., Anderson v. Alpha Portland Indus., 836 F.2d at 1519 ("coordination of benefits is inconsistent with vesting"). The Anderson court reasons that a coordination of benefits clause "reduces benefits to be paid to all retirees," and thus those health benefits cannot be said to be vested entitlements. 836 F.2d at 1519. Here, however, Rexam has not shown that the coordination of benefits clause necessarily means that it may reduce benefits paid to retirees; Plaintiffs' reasonable interpretation of the clause is that it merely prevents retirees from duplicative recovery of benefits. To the extent that the Eighth Circuit sets forth a per se rule that coordination of benefits clauses is inconsistent with vesting, the Court finds this approach unpersuasive. It would mean that parties to a CBA who wished to provide vested welfare benefits would not be able to allow retirees to receive benefits from new government programs.

Rexam also cites extrinsic evidence which it argues shows that the parties did not intend to vest retiree health benefits. According to Rexam, one of its predecessor companies asserted in 1989 litigation, in which IAM representatives participated, that there was no intent to vest retiree benefits for either salaried or union employees. However, Rexam provides no additional evidence to support this prior assertion. Rexam also points to the testimony of former union representative Reginald Newell that, over the

United States District Court

For the Northern District of California

course of the negotiation of a Basic Agreement, the IAM twice requested, and was refused, language guaranteeing that retirees' medical coverage would not be reduced.  Second Gibson Aff., Ex. 1, Newell Dep. 195, 202, 217-18.  The relevance of Rexam's proffered evidence relating to the Basic Agreement, which is not at issue in this action, is not clear.  Moreover, Mr. Newell himself explained that, although retired workers lacked an explicit guarantee against reduction of benefits, he did not believe at the time that the company had the unilateral right to terminate medical benefits. Newell Dep. 195.

Rexam also relies on changes made to retirees' benefits as evidence that medical benefits were not vested and could be changed at will by the company.  For instance, Rexam notes that IAM retirees from the San Leandro and Modesto plants who retired prior to 1983 received only "base" medical benefits for hospitalization, not including major medical or prescription drug coverage, which these retirees only received after Rexam's later decision to consolidate administration of its medical benefits plans.  Second Hardin Aff. ¶¶ 6-7.  However, Rexam does not dispute that all of the members of the proposed subclasses did retire pursuant to CBAs which promised them some level of benefits, so even if subsequent increases resulted in gifts rather than entitlements, Rexam's argument does not support its 2006 elimination of all health benefits.  To the extent that Rexam increased or improved retiree health benefits, this is not inconsistent with vesting, because Rexam was adding to benefits required by contract, and not taking away benefits provided by the contract.  Because the benefit

27

United States District Court

For the Northern District of California

changes identified by Rexam were not the result of negotiated modifications, the Eighth Circuit cases regarding negotiation of modifications to retiree health benefits do not apply here.  Cf. Morrell, 37 F.3d at 1307 ("The fact that modifications were routinely negotiated is fundamentally inconsistent with the notion that any retirement health benefits were ever vested") (emphasis in original) (citing Anderson v. Alpha Portland, 836 F.2d at 1519).

     However, Plaintiffs have not established that all retirees enjoy the same likelihood of success with respect to the full panoply of benefits which they enjoyed until 2006.  Plaintiffs assert that improvements made to class members' health benefits, such as added prescription drug coverage for San Leandro and Modesto class members who retired prior to 1983, were "novations" to the CBAs.  Plaintiffs provide no legal authority to support this argument.  Because the changes made by Rexam to these retirees' benefits did not result in a significant reduction in bargained-for benefits, there is no reason to think that the change caused the CBAs to be replaced by new agreements.  Nor have Plaintiffs shown that their success in obtaining reinstatement of those benefits that were not provided at the time they retired is likely to be greater with respect to their ERISA claims.

     In sum, Plaintiffs have shown that they are likely to succeed on the merits of their LMRA claim that they have a vested entitlement to the health benefits that they received when they retired.  However, Plaintiffs have not shown that they likely enjoy vested rights to all of the benefits they were receiving as of December, 2005.

III.   Probability of Irreparable Harm

    The parties also dispute whether Plaintiffs have shown that they have been or will be irreparably harmed if an injunction does not issue.

    A.  Applicable Law

    In order to show that they are entitled to a preliminary injunction, Plaintiffs must show that they will be exposed to irreparable harm.  Carribean Marine Servs. Co., Inc., v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988) (citing Los Angeles Mem'l Coliseum Com. v. Nat'l Football League, 634 F.2d 1197, 1202-03 (9th Cir. 1980)).  "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." Id. (citing Goldie's Bookstore, Inc. v. Superior Court, 739 F.2d 466, 472 (9th Cir. 1984)).  "Injuries compensable in monetary damages are 'not normally considered irreparable.'"  Cotter v. Desert Palace, Inc., 880 F.2d 1142, 1145 (9th Cir. 1989) (quoting Los Angeles Mem'l Coliseum Com., 634 F.2d at 1202).

    To support its contention that Plaintiffs have failed to show irreparable harm with the required specificity, Rexam relies primarily on Adams v. Freedom Forge Corp., 204 F.3d 475 (3rd. Cir. 2000),[6] in which the Third Circuit overturned an injunction against

_____

    [6]The other cases cited by Rexam are factually inapposite in part because they involve requests for injunctions against state prisons, a circumstance in which injunctions are to be used "sparingly."  Stevens v. Harper, 213 F.R.D. 358, 367-68 (E.D. Cal. 2002) (finding allegations of individual violations insufficient to support requested class-wide injunctive relief); see also Lewis v. Casey, 518 U.S. 343, 349 (1996) (finding no basis for class-wide injunction where plaintiffs showed only isolated instances of class-wide injury).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

a company's plan to switch managed care programs, which would have resulted in retirees' payment of increased premiums and co-payments.  It reasoned that, because only a small number of retirees actually alleged that they would forgo needed medical care under the proposed managed care program, the plaintiffs' showing was insufficient to justify the requested class-wide injunction. 204 F.3d at 487.  The Third Circuit also criticized some of the decisions relied upon by Plaintiffs, including United Steel Workers of America v. Textron, Inc., 836 F.2d 6 (1st Cir. 1987), for substituting "common sense" for evidence, on the grounds that this unfairly shifted the burden to defendants to disprove the need for an injunction.

In Textron, the First Circuit upheld a preliminary injunction against a company that failed to pay insurance premiums, finding that the district court could properly consider "general facts that are either commonly believed or which courts have specifically held sufficient to show irreparable harm," such as

> (1) most retired union members are not rich, (2) most live on fixed incomes, (3) many will get sick and need medical care, (4) medical care is expensive, (5) medical insurance is, therefore, a necessity, and (6) some retired workers may find it difficult to obtain medical insurance on their own while others can pay for it only out of money that they need for other necessities of life.

836 F.2d at 8; see also Helwig v. Kelsey-Hayes, Co., 857 F. Supp. 1168, 1179-80 (E.D. Mich. 1994) (enjoining company from raising co-payments and premiums, even though some putative class members were likely well-off, because others were retired secretarial and clerical workers who likely faced hardship); Schalk v. Teledyne, Inc., 751 F. Supp. 1261 (W.D. Mich. 1990) (finding additional

30

United States District Court

For the Northern District of California

yearly medical expense of $600 to $2000 would impose hardship on retirees and the uncertainty of knowing how much money would be needed to cover medical expenses would cause irreparable harm of anxiety).

Plaintiffs argue that the Third Circuit's approach in <u>Adams</u> is inconsistent with that taken in the Ninth Circuit.  In <u>Beltran v. Meyers</u>, 677 F.2d 1317, 1322 (9th Cir. 1982), the court upheld a preliminary injunction against the State of California's application of a transfer of assets rule for Medicaid eligibility. The plaintiffs had been denied Medicaid benefits on the basis of the rule, and the court summarily held, "Plaintiffs have shown a risk of irreparable injury, since enforcement of the California rule may deny them needed medical care.  That is a sufficient showing."  677 F.2d at 1322; <u>see also</u> <u>Newton-Nations v. Rogers</u>, 316 F. Supp. 2d 883, 888 (D. Ariz. 2004) (enjoining implementation of copayments for State Medicaid benefits where plaintiffs showed that increase in costs would likely cause some Medicaid recipients to be denied care) (citing <u>Beltran</u>, 677 F.2d at 1322).  The plaintiffs in <u>Beltran</u> and <u>Newton-Nations</u>, however, were, by definition, so poor that they could not otherwise afford any medical care, and therefore the finding that they faced irreparable harm could have been a reasonable inference even without any particularized showings by individual class members.

In <u>LaForest v. Former Clean Air Holding Co.</u>, 376 F.3d 48 (2d Cir. 2004), the Second Circuit upheld the district court's preliminary injunction against a company's proposed increases in deductibles and co-payments, despite the eligibility of ninety

31

percent of prospective class members for Medicare, on the basis of six affidavits showing that prospective class members faced health risks, severe financial hardship, inability to purchase necessities and anxiety associated with uncertainty.  In doing so, it considered the competing standards set forth in <u>Adams</u> and <u>Textron</u>, but expressly left open whether those cases, or something in the middle, would be its governing approach.  376 F.3d at 58.  Instead, the Second Circuit found that, even under <u>Adams</u>, plaintiffs had

> provided a sufficient foundation that the six affidavits on which the district court relied are representative of the class.  On that issue, it is worth noting that every member of the class was either an employee of the same firm or is a surviving spouse of such an employee, and defendants do not contest the fact that the average age of the approximately 600 retirees at issue is 83 years old.

<u>Id.</u>  It further noted that, "while it is possible that class members will suffer varying degrees of harm, such is the nature of induction.  It does not produce certainty; it produces probability."  376 F.3d at 58 n.7.  In essence, <u>LaForest</u> does chart a middle course between <u>Adams</u> and <u>Textron</u>, requiring plaintiffs to show both particularized harm through their affidavits and reason to infer that the harms faced by the declarants are representative of prospective class members generally.  The Court finds this analysis to be persuasive, and consistent with the approach so far taken by the Ninth Circuit.  Plaintiffs therefore must first show proof of particularized harm through affidavits, and then reason to conclude that these harms are representative.

    B.   Analysis

    First, through the affidavits submitted, Plaintiffs have shown that Rexam's termination of medical benefits has caused, and will

United States District Court

For the Northern District of California

1   continue to cause, particularized, irreparable harm.  The severity

2   of that harm will clearly vary depending on the individuals'

3   medical needs, ranging from Mr. Russell and Ms. Smith, who

4   anticipate that they will have to postpone or forego needed

5   prostate and dental surgery, respectively, to the Wesemans, who

6   must pay an additional $261.14 for supplemental insurance and

7   therefore have cut back on spending for grocery trips and visiting

8   family.  Some declarants focus on anxiety about the future rather

9   than imminent harm; this is unsurprising in light of the purpose of

10  insurance to cover unexpected costs.

11      Rexam maintains that the affidavits are insufficient to show

12  particularized, irreparable harm.  For instance, Rexam argues that

13  having to choose between paying for medicine and being able to

14  afford hunting and fishing trips is not a choice between medicine

15  and necessities.  Rexam's arguments go to the degree, rather than

16  the sufficiency, of the harms alleged.  It is true that not being

17  able to afford to partake in a vacation or to visit family is a

18  much less serious harm than being forced to forego necessities of

19  life; yet for retirees, not being able to travel may be an

20  incompensable harm.  Similarly, the fact that no declarant

21  apparently is so impoverished as to qualify for the Medicare Part D

22  low income subsidy does not mean that the declarants do not state

23  irreparable harm.

24      Rexam also faults the declarants for not disclosing their

25  liquid assets or, in some cases, not specifying the amount of

26  Social Security they receive.  While these points somewhat affect

27  the weight of Plaintiffs' evidence, the declarants still show

28

**United States District Court**

For the Northern District of California

33

United States District Court

For the Northern District of California

irreparable harm.  Almost all of the retirees state that they have
no "income" other than pension and Social Security, and that they
are not sure how they would pay for large medical expenses.  Those
who do report the amount of their Social Security payments show
that they are modest and comparable to the size of their pensions,
which is to be expected.

Rexam specifically attacks the declarations of Mr. Borrero,
Ms. Angotti and Mr. Griffith because they state that they have
found Rexam benefits to be valuable because they cover the
"substantial amounts of the cost Medicare does not pay," despite
the fact that Rexam's records show that those particular
individuals received nothing or very little over the past three
years.  These declarants may base their statements on medical needs
that arose prior to 2003 or were incurred by dependants; Mr.
Borrero, for instance, specifically states that he learned of the
high costs of hospitalization based on past experience with his
wife.  Borrero Decl. ¶ 9.

More generally, the declarations are particularized evidence
of the irreparable harm of anxiety, even for those retirees who
ultimately may not take advantage of Rexam benefits during the
course of this litigation.  Although this type of harm is much less
severe than that of an individual who foregoes medical care, it is
not de minimis.

With respect to the second prong of the LaForest analysis, the
Court finds that it can reasonably infer that the harms faced by
the declarants are representative of prospective class members
generally.  As in LaForest, the fact that all prospective class

34

United States District Court
For the Northern District of California

members either worked for the same company or had a spouse who did
is reason to think that the declarants are representative in terms
of age and income level.  The Court can reasonably infer that all
or virtually all retirees will be faced with some increased
financial anxiety as a result of Rexam's termination of their
benefits.  Neither Rexam nor Plaintiffs can be certain which class
members may encounter increased medical needs during the course of
the litigation, but this is another factor supporting the
Plaintiffs' motion for preliminary relief.

For this reason, the Court finds that Plaintiffs have shown
that they will suffer irreparable harm if an injunction does not
issue.

IV.  Balance of Hardships

As described above, Plaintiffs have shown that they have and
will suffer irreparable hardships that are serious, but, for the
most part, not very severe.  On the other hand, Rexam shows no
hardship other than the economic costs of transitioning the
retirees back to their plans, which it estimates to be about
$122,000, and the costs of continued coverage, an estimated
$504,000 per year.

The Ninth Circuit has established that, faced with "a conflict
between financial concerns and preventable human suffering, we have
little difficulty concluding that the balance of hardships tips
decidedly in plaintiffs' favor." Rodde v. Bonta, 357 F.3d 988, 999
(9th Cir. 2004) (quoting Lopez v. Heckler, 713 F.2d 1432, 1437 (9th
Cir. 1983)).  Even though the hardships faced by Plaintiffs are
less severe than those in Rodde, the balance of hardships is

35

United States District Court
For the Northern District of California

1  weighted in the same direction.   Furthermore, Rexam knowingly

2  risked the transition costs attendant to any injunctive relief by

3  terminating benefits in the face of this lawsuit and the IAM's

4  defense of Rexam's claims against it in Minnesota district court.

5  V.   Public Interest

6      To the extent that the public interest factor is relevant

7  here, it favors Plaintiffs.   There is a public interest in the

8  continued provision of welfare benefits guaranteed by CBAs and

9  ERISA.   Medicare itself demonstrates the obvious public interest in

10  the health and well-being of senior citizens.

11  VI.   Security Bond

12      Rexam asks that the Court require Plaintiffs to post a $1.5

13  million bond.   Rexam characterizes the lawsuit as a "commercial

14  dispute," and cites Michaels v. Internet Entertainment Group, 5 F.

15  Supp. 2d 823, 842 (C.D. Cal. 1998), in which a district court

16  required two wealthy entertainers to post a bond upon receiving an

17  injunction against the distributor of a video tape.   Given the

18  financial condition of Plaintiffs, and the public interest in

19  collectively-bargained-for health benefits, a modest bond is more

20  appropriate here.   See, e.g., Yolton v. El Paso Tennessee Pipeline

21  Co., 318 F. Supp. 2d 455, 475-476 (E.D. Mich. 2003) (surveying

22  similar retiree cases and finding bonds awarded in amounts from

23  $50,000 to $100,000 despite monthly costs ranging from $90,000 to

24  $160,000).   Because Rexam may fulfill the terms of the injunction

25  at a relatively low monthly cost, the Court will require Plaintiffs

26  to post a $25,000 bond.

27

28                                      36

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

CONCLUSION

The Court grants Rexam's request for leave to submit additional authority (Docket No. 105).

The Court grants in part Plaintiffs' motion for a preliminary injunction (Docket No. 74).  The Court hereby orders Rexam to reinstate all medical and prescription drug benefit plans provided before January 1, 2006 to any retirees (and spouses or surviving spouses) who retired from the San Leandro or Modesto, California, Kent or Vancouver, Washington or Gary, Indiana facilities covered by an "independent agreement" negotiated by an IAM affiliate and Rexam or a predecessor.  Rexam must reinstate these medical and prescription drug benefits only to the extent that retirees were entitled to them at the date of their retirement, as set forth in the parties' Second Joint Supplemental Submission.  For those retirees who were enrolled in Rexam's prescription drug plan and who choose or have chosen to enroll in Medicare Part D, Rexam must pay their premiums as well reimburse any difference between retirees' costs incurred under Part D and those that would have been incurred under the Rexam plan.  The terms of the injunction are retroactive to January 1, 2006.

The Court acknowledges that the administrative costs of complying with this injunction may exceed the administrative costs of reinstating all benefits as previously calculated by Rexam. Therefore, Rexam may, as an alternative to complying with the terms of the injunction as stated above, reinstate all medical and prescription drug benefits that were provided prior to January 1, 2006, for all class members.

37

1        Rexam is also enjoined from terminating the health benefits of
2   any class member receiving or entitled to receive benefits under
3   these plans.   The preliminary injunction takes effect on the filing
4   of a $25,000 bond by Plaintiffs.   Rexam must fully comply with this
5   injunction within six weeks of the date the bond is filed.

6

7        IT IS SO ORDERED.

8

9   Dated:      6/14/06

10                                    _____
11                                    CLAUDIA WILKEN
                                      United States District Judge
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                      38

United States District Court
For the Northern District of California